State v. Browning.

---

THE STATE, JOSEPH KAIGHN, prosecutor, *vs.* BENJAMIN BROWNING, Clerk of the county of Camden.

THE STATE, JOSEPH M. KAIGHN, prosecutor, *vs.* JESSE W. STARR, JAMES P. MICHELLON, and JOHN M. PASCHALL, Trustees of Liberty School District No. 5, of the township of Newton, county of Camden.

THE STATE, MARMADUKE C. COPE, STEPHEN P. MORRIS, WILLIAM M. COLLINS, and JOSEPH M. KAIGHN, prosecutors, *vs.* RICHARD SNOWDEN, Collector of Newton township, Camden county.

1. In order to set aside the alteration of an incorporated school district, the original proceedings of the inhabitants voting such alteration, or the original certificate of alteration, or both, should be brought into court, and the *certiorari* in such case should be directed to the person or persons having the legal custody of such papers.

2. An incorporated school district cannot alter, abolish, or absorb another district, incorporated or unincorporated, without notice to and the consent of such district.

3. School taxes assessed upon property lying in a district illegally absorbed by another district, will be set aside on application by persons aggrieved, upon *certiorari,* but the whole assessment will not be set aside, although the alteration be illegal, and the notice to the assessor be defective.

The above causes were argued together at February Term, 1859, before Justices HAINES and CLAWSON.

· T. H. Dudley, for plaintiffs in certiorari.

A. Browning and P. L. Voorhees, for defendants.

The facts of the cases sufficiently appear in the opinion of the court, delivered by

CLAWSON, J. The object of the first of this series of certioraris is to bring up the record of certificate of alteration of an incorporated school district, called "Liberty, No. 5," in the township of Newton, in the county of Camden. A certificate of the alteration intended is made out, and which appears among the papers brought up, dated April 12th, 1858, signed by the trustees of No. 5 and town superintendent of Newton township, the same having been sent to the defendant, the clerk of the county of Camden, to be recorded, pursuant to the statute. There is no law authorizing this certificate to be filed, and left permanently in the clerk's office, nor is there any law making the record thereof evidence, like many other records of said office. And all we have in answer to the writ is a certified copy of the certificate, not the record itself, as commanded, nor the original certificate. There seems to have been an oversight in the legislature, in not making this record, or a certified copy thereof, evidence, if such was the intention. By virtue of the statute, as it now is, the clerk has a mere special and limited possession of the certificate, for the single purpose of copying or recording it. When copied, the trustees of the corporation, or incorporated district, are again entitled to have it, they being the legal possessors thereof, and have the legal and exclusive right to its custody, for and in behalf of the corporation. The possession of the clerk whilst making the record is a mere incident; that may be done without either actual or constructive possession on his part. The

original certificate being the property of the corporation which is represented by the trustees, and they being the legal custodians of it for the use and benefit of the corporation, the writ should have been directed to them, commanding them to bring it up, and not to the clerk to send the record or a certified copy of it.

This writ must therefore be dismissed with costs.

The command of the second of this series of writs is, to certify and send to this court all resolutions and proceedings of said trustees and of the taxable inhabitants of said school district No. 5, had at a meeting held by them on April 5th, 1858, relative to raising two thousand dollars tax for school purposes, together with all things touching and concerning the same. By the return made, and by the papers and evidence produced, it appears that the inhabitants of No. 5 assembled on April 5th, 1858, in pursuance of legal notice, for the purpose of deciding whether the trustees of said district should be authorized to purchase land, to build a school-house thereon, and to determine whether they should raise additional funds for such purposes, and for maintaining free schools in said district by taxation, &c. By the minutes of proceedings and the resolutions of the meeting of the inhabitants, which are returned with the writ, it appears that the first thing done, in pursuance of the above-mentioned notice, was to resolve to alter No. 5, so as to take in and include the whole of No. 7, thus abolishing and absorbing that district altogether. Then they resolve to raise two thousand dollars, by tax, for the purposes aforesaid; it thus evidently appearing that the alteration of the district was a material part of the contemplated proceedings to raise the desired funds. These were all proceedings by No. 5, alone, not one of the inhabitants of No. 7 being present.

The object now sought is to set aside this alteration and the assessment ordered to raise the two thousand dollars. As to setting aside the whole assessment, we think it clear, upon the authority of the case of the *State* v.

*Kingsland,* 3 *Zab.* 85, that it ought not to be done, and that it is unnecessary in order to give the relief asked for by the prosecutor. The principle settled in this case is not to set aside the whole assessment, although illegal, but to grant relief therefrom to those who ask it. But more of this hereafter.

No notice whatever was given by the trustees of No. 5 of any intention to alter their corporate limits, either to the inhabitants of No. 5 or No. 7. Twenty-three inhabitants, twenty-one of whom are legal voters of No. 5, assemble in pursuance of the notice above specified. By the testimony, it appears that similar notices were put up in No. 7 and No. 5 eleven days prior to the fifth of April— that is, notices signed by the trustees of No. 5, who thus endeavor to assume in advance the control of No. 7, without the knowledge or consent of the trustees or any taxpayer or inhabitant thereof. No intimation, of the remotest kind, is given to the inhabitants of No. 7 that they are to be abolished as a school district. We find them on the same day (April 5th, 1858,) engaged in the election of trustees for their own district, whilst No. 5 is engaged in contriving and scheming to compel them to contribute to the desired amount of funds for the school projects of their district.

There is no evidence that it was the intention of the trustees of No. 5 to add No. 7 to their district previous to the hour of meeting; but soon after organizing the meeting, the addition of No. 7 is made a preliminary and necessary part of their proceedings, to secure the necessary amount of tax for the above-mentioned objects. This is certainly contrary to every principle of justice—it is but a re-enactment of the old offence of taxation without representation. It certainly is neither the meaning nor the spirit of the school law, that after a township has been divided into districts, in pursuance of the act by the town superintendent, and some of the districts, by submitting, perhaps, to heavy taxation, have possessed themselves of

large and comfortable school-rooms, and all the necessary attachments and conveniences used in common or free schools, that they should be absorbed or annexed by their more tardy, yet more potent neighbors, and compelled by them to contribute again to the purposes which should have been accomplished by themselves long before.

By the 41st section of the school law, an incorporated school district may be altered or abolished, with the consent of a majority of the taxable inhabitants of said district. Give to the words of this section a strict and literal signification, (this seems to be the construction claimed by defendants' counsel) and there is no protection for the rights or property of any person, or of any district, incorporated or unincorporated. Every incorporated district would at once claim the privilege and power of acting, in this respect, uncontrolled and uncontrollable. Any incorporated district may lessen or abolish any other, incorporated or unincorporated, at pleasure, by adding to itself, if this be the true construction of the section. Absolute power, under and by virtue of this provision, certainly never was intended to be given to any district to alter or abolish another, because the same right may be claimed by every other; and the exercise, or the attempt to exercise such power would necessarily result in absolute confusion.

Again, if a district has the right to alter or extend its limits, by taking in another district, or a portion thereof, at pleasure, without notice to or obtaining the consent of the inhabitants or owners of the part to be taken in, and at once tax the newly added portion to suit their wishes, may not the added district, after the design shall have been accomplished, as unceremoniously be put out again, and again left to take care of itself? Suppose, for a moment, it be a portion only of an adjoining district which is added; when it is again cut loose, does it at once become a part and parcel of the district from which it was taken? or is the consent of that district first to be ob-

tained? Suppose, again, that that consent is withheld, must this portion become another independent district, and be driven to the necessity of a third assessment for school-houses and school purposes? or may it resolve itself into an incorporated district, and, in its own good time, absorb and annex both the others? Suppose, again, that two incorporated districts simultaneously annex each to the other, what is to be the result? These things may all occur, if the construction contended for by defendants' counsel be the correct one; they are mere suppositions, it is true, yet they are the legitimate results of such con- struction. Such suppositions wear too much the sem- blance of realities that may occcur, if they have not al- ready occurred in fact, to warrant the sanctioning of such construction. Such injustice never was intended in the practical operation of the school law, and the protective power of this court never will be invoked in vain by the weak, against such gross injustice by the strong. No. 7 has within its limits but nine children and seven taxable inhabitants. No. 5 has about one hundred legal voters. So that, so far as the numerical strength of the two dis- tricts is concerned, No. 5 would have had greatly the ad- vantage if No. 7 had been invited to the meeting, and been allowed to participate in the proceedings. But when no notice is given of the intention to absorb them, and when, with one breath, they add No. 7, and with the next, subject them to taxation, the wrong looks doubly suspi- cious—it looks as if a surprise was intended; and being situated, in reference to these proceedings, similarly to an opposite party in a suit, the court will always exercise its power to relieve. But we must give a more liberal con- struction to this section, such a construction as will se- cure the rights and powers of others, as well as our own. By the construction contended for by defendants' counsel, the action of the town superintendent is set at naught, because he may in one moment set off a district in any part of his township, and the next moment we find it ab-

sorbed by another district. Furthermore, such a construction would render the section itself powerless and futile.

Again, if this alteration was made on the fifth of April, 1858, the legal majority of inhabitants of No. 5 did not assent. It is proved that there were, at that time, about one hundred legal voters in No. 5, probably between one hundred and one hundred and six. There were but twenty-three votes in favor of it at the meeting on the 5th, and two of these were illegal. A majority of all the legal voters of the district is necessary to alter an incorporated district; and the fact that such majority consented, must be stated in the certificate. *State* v. *Deshler et al.*, 1 *Dutcher* 177. Now if this alteration was made on the fifth, only about one-fifth of the legal voters of No. 5 approved it. But it is said the alteration was not made until the 12th of April, 1858, that being the date of the certificate signed by the trustees and town superintendent. It does not necessarily follow, that because the certificate bears date April 12th, 1858, that the alteration was made on that day; nor does it appear, by the certificate, when the alteration was made; it fixes no time—it merely states the fact that by the consent of a majority of the taxable inhabitants of said district, the same *has been* altered, not that it *has been this day altered*, which would be understood to be a direct reference to the date of the certificate: it leaves the time when such alteration was made altogether uncertain, to be guessed at, or to be ascertained by some other legal certificate of alteration, or the evidence in the cause. The petition (as it is called) bears no date; the minutes of the meeting, alone, fix any certain time for this alteration. If altered at some time subsequent to April 5th, 1858, still it does not clearly appear, by the certificate nor by the evidence, that a majority of the legal voters, including those whose names appear on the so-called petition, assented, which should be the case. The certificate, it is true, states the fact, but the evidence

State v. Browning.

proves the contrary, or at least renders it exceedingly doubtful.

Again, if the alteration was not made on the 5th, but on some subsequent day, we get ourselves in the dilemma of taxing No. 7 before it becomes a part of No. 5; because there is no pretence that there was any other resolution, than the one passed on the 5th, authorizing the tax to be raised. It will not do to say that the inhabitants of No. 7 had notice of the meeting to raise this tax. True it may be, that notices to the effect above mentioned, signed by the trustees of No. 5, were put up within the limits of No. 7 eleven days prior to the meeting at which the resolution was passed—at a time when the inhabitants of No. 7 were taking care of their own affairs, as they had a right to do, and when they had no reason to suppose that they had anything to do with the district meetings of No. 5 for raising school tax. They were not bound to govern their actions by any such notice, nor could they be expected to pay any attention to it. They are presumed, at the same moment, to be looking after the interests and necessities of their own children and schools, and, perhaps, discussing and adopting a similar resolution for school tax for themselves.

As to the single resolution authorizing the tax of two thousand dollars to be raised, we see no good reason for interfering with it. Incorporated school districts, by the 11th section of the supplement to school law, approved March 14th, 1851, (*Nix. Dig.* 739, *pl.* 42,) have an undoubted right to raise, by taxation, any such sum of money as two-thirds of the inhabitants assembled shall agree upon. No. 5, in pursuance of their notice, resolves to raise two thousand dollars, which they had a perfect right to do. And so far as this resolution, alone, is concerned, it is a matter, perhaps, with which we have no right in this case to interfere. Ample relief can be given to the prosecutors who complain of assessments by virtue of this resolution under the third writ of this series.

The court will not set aside the whole assessment, when it can give proper relief without so doing. The *State* v. *Kingsland*, 3 *Zab.* 85. Nor can we, in this case, relieve the prosecutor of the tax assessed against him by virtue of this resolution, because the writ does not and could not bring up the tax. Whatever view, however, may be taken with reference to the alteration attempted to be made, the whole proceeding seems to be radically defective and unjust, and must be set aside.

The object of the last of the series is to bring up the assessment of taxes upon the property of the prosecutors in the township of Newton, county of Camden, in pursuance of the resolution above mentioned; and with regard to this, after the decision of the second case, there need but little be said.

We have produced in evidence, among other papers, what is intended for the sworn certificate of the trustees of School District No. 5, directed to the township collector, notifying him that two thousand dollars had been ordered to be raised by said district for school purposes. This certificate bears date April 17th, 1858, and says, in the body of it, that the tax was ordered to be raised on *April 5th*, 1858, the day of the meeting above mentioned, and previous to the 12th, the date of the certificate of alteration. However, without discussing this matter further, it is sufficient that the certificate is defective, in that it does not show upon its face a compliance with the requirements of the 11th section of the act of 1851. *Nix. Dig.* 739. It states the fact that notice was given of the time, place, and purpose of the meeting; but it does not state what the notice was, nor when and where copies were put up, nor the purpose of the meeting; and in this respect is clearly insufficient, according to the ruling in the case of *The State* v. *Hardcastle*, 2 *Dutcher* 143.

The above reason is sufficient and fatal; but another matter upon the face of this certificate, and not attended

to by counsel, might be mentioned, which is, the *jurat*, or certificate of the justice. It states that the trustees, naming all three of them, were "sworn and affirmed," and upon their "oaths or affirmations say," &c. Does he mean that they were all sworn and all affirmed? or that some were sworn, and some affirmed? if the latter, which sworn, and which of them affirmed? Could perjury be assigned upon such a paper? Let the assessments made against the prosecutor for school tax by the collector of Newton township, in pursuance of the said notice, be set aside and for nothing holden.

AFFIRMED, 4 *Dutch.* 556.